IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RELIASTAR LIFE INSURANCE COMPANY :
                Plaintiff :
                 :
  v.                 :    1:CV-08-1942
                 :    (JUDGE VANASKIE)
FAY MOORE,            :
KRISTI HATFIELD-BINGAMAN    :
              Defendants :

MEMORANDUM

    This interpleader action was brought by ReliaStar Life Insurance Company ("ReliaStar")

against competing claimants to the proceeds of a life insurance policy held by Budd A. Moore.

Kristi Hatfield-Bingaman, the deceased's niece, claims the proceeds as the named beneficiary

on the policy. Fay Moore, the deceased's wife, is the second claimant to the proceeds. The

claimants' disagreement stems from a disclaimer signed by Hatfield-Bingaman, the designated

beneficiary on the policy, after her uncle's death, disclaiming her interest and directing the

policy be payed to the deceased's estate.

    The interpleader, ReliaStar, has been dismissed from the action and currently pending

before the Court is Kristi Hatfield-Bingaman's Motion for Summary Judgment. (Dkt. 34.)[1]

_____

    [1] For the convenience of the reader of this Memorandum opinion in electronic format,
hyperlinks to the Court's record and to authority cited herein have been inserted. The Court
accepts no responsibility for, and does not endorse, any product, organization, or content at
any hyperlinked site, or at any site to which that site might be linked. The Court accepts no
responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink

Because there are genuine issues of material fact as to whether the defenses of duress, fraudulent misrepresentation, or violation of Faye Moore's fiduciary duty void the otherwise valid disclaimer, the summary judgment motion will be denied.

## I. BACKGROUND

Budd A. Moore ("Budd"), as an employee of the Board of Education of Washington County, was eligible to participate in the Board's employee welfare benefit plan and was eligible for basic life insurance benefits and supplemental life insurance benefits. (Comp., Dkt. 1, at ¶¶ 6-7.) Budd participated in the plan and on June 8, 1994, completed a Beneficiary Designation form naming his niece, Kristi Lynn Hatfield (n.k.a. Kristi Lynn Hatfield-Bingaman) ("Hatfield-Bingaman"), as the primary beneficiary of a life insurance policy. (Id. at ¶ 8.) Eight years later, in 2002, Budd married Faye Moore ("Moore"). (Hatfield-Bingaman's Statement of Undisputed Material Facts ("HBSUMF"), Dkt. 36, at ¶ 52.)

Budd died on April 21, 2008. Moore is the executrix of Budd's estate. (HBSUMF, Dkt. 36, at ¶ 1.) After Budd's death, Moore learned that Hatfield-Bingaman was the named beneficiary of the life insurance policy ("the Policy") and that Moore could only obtain the proceeds of the Policy if Hatfield-Bingaman signed a disclaimer. (Id. at ¶ 2.) On or about May 6, 2008, Moore asked Hatfield-Bingaman to go to Attorney Martha Walker's law office because

ceases to work or directs the user to some other site does not affect the opinion of the Court. The page numbers referenced in this Memorandum opinion refer to the page number of the electronic CM/ECF record.

there were papers that Moore wanted her to see.  (Id. at ¶ 3.)

During the May 6, 2008 conversation, Moore did not tell Hatfield-Bingaman anything about the Policy, did not tell her that she was the named beneficiary of the Policy, did not describe the "papers" that she wanted her to see, and did not tell Hatfield-Bingaman that she was going to be asked to sign something at Attorney Walker's office.  (Id. at ¶ 5.)  Moore knew that Hatfield-Bingaman did not know she was the beneficiary of the Policy.  (Id. at ¶ 6.)  When Moore asked Hatfield-Bingaman to go to Attorney Walker's office, Hatfield-Bingaman responded along the lines of Budd "probably left the boys a trust fund or something for school." (Id. at ¶ 7.)  Moore chose not to correct Hatfield-Bingaman's assumption, knowing that she would see her at Attorney Walker's office, where she would explain everything, and she stated she felt awkward that Budd had not left anything to the boys.  (Moore's Statement of Undisputed Material Facts ("MSUMF"), Dkt. 42, at ¶ 7.)

Moore wanted Hatfield-Bingaman to go to Attorney Walker's office to ask her to sign a disclaimer of her rights to the Policy.  (HBSUMF, Dkt. 36, at ¶ 9.)  Prior to the May 8, 2008 meeting, Moore had met with Attorney Walker regarding Hatfield-Bingaman's potential receipt of the Policy proceeds.  (Id. at ¶ 9.)

Attorney Walker is the attorney for Budd's estate and has served as Moore's personal attorney.  (Id. at ¶ 4.) She has practiced law for over 35 years, and has done estate work.  (Id. at ¶ 48.)  Hatfield-Bingaman is a high school graduate.  (Id. at ¶ 46.)  Moore is a teacher and

3

has a Master's Degree.  (Id. at ¶ 47.)

At the May 8, 2008 meeting, Attorney Walker told Hatfield-Bingaman "that Moore wanted to talk to her about 'something that would prevent them from having to take legal action'." (Id. at ¶ 13.)  During the course of the meeting, Moore indicated that she needed the money from the Policy to "[t]ake care of [her son] and take care of the home, take care of the life that we had together that I need to financially take care of . . . ." (Moore Dep., Dkt. 43-3, at 14.)  She also indicated that she needed the money to pay Budd's bills and to pay for funeral expenses.  (Id.)  Accordingly, she asked Hatfield-Bingaman to sign a disclaimer to her rights under the Policy ("the Disclaimer").

"At the meeting, Moore gave [Hatfield-Bingaman] an unsecured note in the total amount of $24,000 and told [her] it was a 'gift.'" (HBSUMF, Dkt. 36, at ¶ 49.)  Moore believed that by making the note it was "a way" to make the Disclaimer binding, "like a contract." (Id. at ¶ 50.)

Hatfield-Bingaman was legally entitled to the Policy proceeds as the named beneficiary of the Policy prior to her execution of the Disclaimer.  (Id. at ¶ 16.)  At the meeting, Attorney Walker did not tell her that she was legally entitled to the Policy proceeds, and neither Moore nor Attorney Walker told her that she had an absolute right to the Policy proceeds.  (Id. at ¶ 18, ¶ 20.)  Neither Moore nor Attorney Walker told Hatfield-Bingaman that "she had an absolute right to the Policy proceeds and no litigation could be brought against her if she didn't sign" the Disclaimer.  (Id. at ¶ 19.)  The May 8, 2008 meeting lasted approximately one-half (½) hour.

(Id. at ¶ 27.)  "Hatfield-Bingaman was not told that she could not consult with an attorney or advisor before signing the disclaimer."  (MSUMF, Dkt. 42, at ¶ 30.)  During the meeting, Hatfield-Bingaman did not ask Attorney Walker any questions.  (HBSUMF, Dkt. 36, at ¶ 29.)

Attorney Walker did tell Hatfield-Bingaman that the Policy was a "$74,000 double indemnity policy."  (Id. at ¶ 10.)  She also expressed relief when Hatfield-Bingaman agreed to sign the Disclaimer and indicated that the signing of the Disclaimer would make legal action unnecessary. Attorney Walker, however, did not indicate who would be parties to any litigation or the basis for any potential litigation.  (See Kilbride Dep., Dkt. 34-7, at 5; Walker Dep., Dkt. 43-6, at 7; Hatfield-Bingaman Dep., Dkt. 34-6, at 4, 7.)

The Policy was not a double-indemnity policy of $74,000.  Instead, the proceeds actually totaled $148,000.  (HBSUMF, Dkt. 36, at ¶ 11.)  Neither Attorney Walker nor Moore told Hatfield-Bingaman that the Policy had a value of $148,000.  (Id. at ¶ 12.)

The Disclaimer was sent to ReliaStar.  By letter dated June 5, 2008, ReliaStar returned the disclaimer to Hatfield-Bingaman.  The ReliaStar letter, however, was addressed to Hatfield-Bingaman "c/o" Attorney Walker because ReliaStar did not have Hatfield-Bingaman's address or phone number.  (Id. at ¶ 36.)  "Moore provided Walker's address when asked to give an address to receive communications from ReliaStar; she knew [Hatfield-Bingaman's] address at the time, but didn't provide it because she 'didn't have it with her'.  Moore told [Attorney] Walker she didn't know [Hatfield-Bingaman's] address."  (Id. at ¶ 37.)  The letter stated that Hatfield-

Bingaman could not use the Disclaimer to direct that the Policy benefits be paid to Budd Moore's Estate. (June 5, 2008 Letter, Dkt. 1-7, at 2.) The letter advised her that if she still wished to disclaim her interest she would need to sign the disclaimer form enclosed with the letter, notarize it, and return it to ReliaStar. (Id.)

"On June 10, 2008, Moore told [Hatfield-Bingaman] she was to return to Walker's office to sign a new disclaimer form. [Hatfield-Bingaman] refused and told Moore she didn't feel comfortable dealing with Walker, who made her feel bad." (HBSUMF, Dkt. 36, at ¶ 40.) On June 11 and June 12, 2008, Hatfield-Bingaman contacted a ReliaStar representative and stated that she had been pressured into signing the Disclaimer at Walker's office. (Id. at ¶ 41.) She advised ReliaStar that she did not wish to disclaim her interest in the Policy. On June 12, 2008, she filed a claim for the Policy proceeds. (Id. at ¶ 44.) It was only when Hatfield-Bingaman spoke with a ReliaStar representative and read the ReliaStar Disclaimer on June 12, 2008, that she discovered the Policy proceeds totaled $148,000. (Id. at ¶ 42.)

In a letter dated June 24, 2008, Attorney Walker sent Hatfield-Bingaman a letter that stated litigation would be filed against her if she did not sign the ReliaStar Disclaimer, and again warned her that she would incur attorneys fees and court costs in the event of litigation. (Id. at ¶ 45.) Hatfield-Bingaman returned the $24,000 promissory note signed by Moore, and refused to sign a new disclaimer.

On October 23, 2008, ReliaStar initiated the current action. (Comp., Dkt. 1.) On

December 19, 2008, ReliaStar filed a Motion for Leave to Deposit Interpleader Funds into the Registry of the Court. (Dkt. 7.) By order dated January 13, 2009, this Court granted the motion and ordered the Policy proceeds deposited in the Court's registry. (Dkt. 13.) On January 22, 2009, ReliaStar deposited a check in the amount of $150,503.88 ($74,000 in standard life benefits, $74,000 in supplemental life benefits, and $2,503.88 in interest) into the Court's registry. (Id.) On June 23, 2009, ReliaStar filed a Motion for Dismissal and Fees. (Dkt. 25.) This Court granted ReliaStar's Motion for Dismissal, but denied the Motion for Costs and Fees on March 1, 2010. (Dkt. 49.)

On August 21, 2009, Hatfield-Bingaman filed a motion for summary judgment as to her cross-claim against Moore. (Dkt. 34.) The motion has been fully briefed and is ripe for review.

II.    DISCUSSION

   A.    Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994). "[S]ummary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds, Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). Once the moving party satisfies its burden, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment if there was adequate time for discovery and a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party" bears the burden of proof at trial. Celotex, 477 U.S. at 322.

B.    Validity of Disclaimer

Hatfield-Bingaman contends that the Disclaimer is unenforceable based on 1) lack of consideration, and 2) rejection of the Disclaimer by ReliaStar. Section 6201 of Title 20 of the

8

Pennsylvania Consolidated Statutes, in pertinent part, provides:

> A person to whom an interest in property would have devolved by whatever means, including . . . a donee under a third-party beneficiary contract (including beneficiaries of life insurance and annuity policies and pension, profit-sharing and other employee benefit plans), may disclaim it in whole or in part by a written disclaimer which shall: (1) describe the interest disclaimed; (2) declare the disclaimer and extent thereof; and (3) be signed by the disclaimant.

20 Pa. C.S.A. § 6201. Section 6204(b.1) provides:

> If the interest would have devolved to the disclaimant by a third-party beneficiary contract (including life insurance and annuity policies and pension, profit-sharing and other employee benefit plans), the disclaimer or copy thereof shall be delivered to the insurance company, employer or other obligor, as the case may be, and to the person who is entitled to the interest by reason of the disclaimer.

20 Pa C.S.A. § 6204(b.1).

> The Disclaimer signed by Hatfield-Bingaman was entitled "Disclaimer" and stated:
>
> I, Kristi Lynn Hatfield-Bingaman, beneficiary of life insurance under the life insurance policy of the Board of Education of Washington County Employee Benefit Fund, Group Policy No: 26257-9GAT, do hereby disclaim any and all of my rights under the aforesaid policy as primary beneficiary, and do direct that the policy benefits be paid to the Estate of Budd A. Moore, c/o Martha B. Walker, Esquire, at the above address.

(Disclaimer, Dkt. 1-5, at 2.) The Disclaimer was signed by Hatfield-Bingaman and witnessed by Attorney Walker on May 8, 2008. (Id.) The Disclaimer was also notarized by Stacey A. Shark. (Id.)

Hatfield-Bingaman's argument that the Disclaimer is void based on lack of consideration is meritless. "The most fundamental rule used when determining the meaning of a statute or

9

rule is to begin with the plain meaning of the language used in the statute or rule." In re Ciaffoni, 787 A.2d 971, 974 (Pa. Super. Ct. 2001). The Pennsylvania legislature did not require consideration to create a valid disclaimer. See 20 Pa. C.S.A. § 6201; In re Pedrick's Estate, No. 67-91-653, 1993 WL 313179, at *4 (Pa. Com. Pl. June 4, 1993) ("consideration is required to support a contractual promise, not a disclaimer of a testamentary devise").

Hatfield-Bingaman's second ground for arguing that the Disclaimer is unenforceable is that ReliaStar's rejection of the Disclaimer renders it a nullity. Hatfield-Bingaman cites no case law in support of her assertion. Hatfiled-Bingaman claims that ReliaStar rejected the Disclaimer "because it failed to meet their requirements and failed to comply with the terms of the policy." (Mt. S.J., Dkt. 35, at 23.) The Policy, however, does not include requirements on how a beneficiary can disclaim an interest, but instead only indicates what will happen with the proceeds if there is no eligible beneficiary. (Policy, Dkt. 1-2, at 14.) The validity of the Disclaimer is thus governed by 20 Pa. C.S.A. § 6201. The Disclaimer described the interest Hatfield-Bingaman was disclaiming, declared the disclaimer and extent of the disclaimer, and was signed by Hatfield-Bingaman. See id. It is thus clear that, unless rendered voidable by virtue of having been procured by fraud, duress, or a violation of a fiduciary duty, the Disclaimer is enforceable

C.      Violation of Fiduciary Duty

Hatfield-Bingaman's first contention in support of her argument that the Disclaimer is

10

voidable is that Moore violated the fiduciary duties she owed to Hatfield-Bingaman as a beneficiary of Budd's estate and by virtue of a "confidential relationship" created between the two claimants at the time that Moore solicited the Disclaimer. (Mt. S.J., Dkt. 35, at 13-15.) Moore counters that she owed no fiduciary duty to Hatfield-Bingaman since Hatfield-Bingaman was not a named beneficiary in Budd's will and there was no confidential relationship between them. (Opp. Mt. S.J., Dkt. 43, at 10.)

Hatfield-Bingaman, of course, must first show that a fiduciary duty or a confidential relationship existed between her and Moore. See Harold ex rel. Harold v. McGann, 406 F. Supp. 2d 562, 571 (E.D. Pa. 2005). Hatfield-Bingaman claims that she is a beneficiary of the Estate because of her designation as the beneficiary of the life insurance benefits and because Budd Moore intended that she share in the assets of his estate. She also contends that there was a "confidential relationship" between her and Moore.

Hatfield-Bingaman cannot establish a fiduciary relationship flowing from Moore's status as Executrix of her late husband's estate on the basis that Budd Moore had designated her as a beneficiary of the life insurance policy. "The proceeds of an insurance policy naming a third person as beneficiary belong exclusively to that person as an individual, and do not constitute part of the insured's estate." Estate of Myers, 544 A.2d 506, 508-09 (Pa. Super. Ct. 1988); see Estate of Stalnaker, 479 A.2d 612, 614 (Pa. Super. Ct. 1984) ("Life insurance proceeds, payable to a named beneficiary on a policy owned by a decedent and insuring that decedent's

11

life, pass outside of the decedent's estate."); In re Burton's Estate, 20 Pa. D. & C. 566, 566 (Pa. D. & C. 1934) ("In the case of an ordinary insurance policy, where the insured designates a third person as beneficiary, the proceeds are payable to the one so designated and form no part of the insured's estate, but if the policy is made payable to his executors or administrators the proceeds become part of his estate at his death.").  As the proceeds of the Policy were not property to be administered as part of Budd's estate, the designation of Hatfield-Bingaman as the beneficiary under the Policy did not render her a beneficiary of Budd's estate.  See In re Burton's Estate, 20 Pa. D. & C. at 566; Estate of Stalnaker, 479 A.2d at 614; Estate of Myers, 544 A.2d at 508-09.  Stated otherwise, because the proceeds of the Policy did not pass through the estate, the designation of Hatfield-Bingaman as the Policy beneficiary did not qualify her as a beneficiary of the estate.  See In re Noonan's Estate, 63 A.2d at 82.  Accordingly, Moore owed Hatfield-Bingaman no fiduciary duties as a result of her being listed as the beneficiary of the Policy.  See id.

It may be, however, that Hatfield-Bingaman is indeed a beneficiary of the estate under Budd's will.  The tenth paragraph of his will provides: "I direct that my Executrix distribute my tangible personal property in accordance with my wishes as expressed in a memorandum written by me and kept by me with the original copy of this Will."  (Will, Dkt. 34-4, at 35.)  The deposition testimony from Moore is unclear as to whether this memorandum was ever found.  What is clear, however, is that the memorandum was not probated with the will.  (Moore Dep.,

12

Dkt. 43-3, at 5.)  It is Moore's contention that "Hatfield-Bingaman was not a beneficiary in the will or the estate."  (Opp. Mt. S.J., Dkt. 43, at 13.)

Moore gave Hatfield-Bingaman Budd's mother's ring, his father's bread basket, and a picture of Budd's mother when she was a little girl.  (Hatfield-Bingaman Dep., Dkt. 34-6, at 4.) Moore had additional items for Hatfield-Bingaman that were described as belonging to the Moore family, including a lamp.  (Moore Dep., Dkt. 43-3, at 13, 18; Hatfield-Bingaman Dep., Dkt. 34-6, at 8.)  Furthermore, Hatfield-Bingaman's affidavit states that it was her "uncle's wishes that all [of her] grandparents things stayed in the family," and that this fact was "discussed several times."  (Hatfield-Bingaman Aff., Dkt. 34-3, at 7.)  These facts tend to support Hatfield-Bingaman's position that she is an intended beneficiary of her late uncle's estate.  As there is a genuine issue of material fact concerning whether Hatfield-Bingaman was a named beneficiary in the memorandum attached to Budd's will, this Court cannot determine whether Moore owed a fiduciary duty to Hatfield-Bingaman.

There are also issues of material fact as to whether Moore had established a confidential relationship with Hatfield-Bingaman when she procured the Disclaimer.   "[A] confidential relationship exists when one party 'has reposed a special confidence in each another to the extent that the parties do not deal with each other on equal terms.'" Harold ex rel. Harold v. McGann, 406 F. Supp. 2d 562, 571 (E.D. Pa. 2005) (quoting In re Clark's Estate, 359 A.2d 777, 781 (1976)).  "A confidential relationship exists 'whenever the law recognizes

13

that a party is bound to act for the benefit of another, and can take no advantage to himself.'" Id. (quoting Gaines v. Krawczyk, 354 F. Supp. 2d 573, 580 (W.D. Pa. 2004)).  As Moore acknowledges, "[a] confidential relationship is 'not limited to any particular association of parties but exists wherever one occupies toward another such a position of advisor or counselor as reasonable to inspire confidence that he will act in goof faith for the other's interest.'" (Brief in Opp. to S.J. Mot., Dkt. 43, at 13 (quoting Frowen v. Blank, 425 A.2d 412, 416-17 (Pa. 1981).)

Whether Moore fostered such a relationship when she arranged for Hatfield-Bingaman to meet with Attorney Walker cannot be determined at this juncture.  Certainly, a reasonable jury could find that Moore had convinced Hatfield-Bingaman that she should rely upon the advice of Attorney Walker in executing the Disclaimer.

"'When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage.'" Matter of Estate of Evasew, 584 A.2d 910, 913 (Pa. 1990) (quoting Young v. Kaye, 279 A.2d 759 (Pa. 1971)).  Should a jury determine that Moore owed Hatfield-Bingaman a fiduciary duty, either by virtue of a confidential relationship or because Hatfield-Bingaman is a beneficiary of her late uncle's estate, there is a genuine issue of material fact as to whether Moore acted with "scrupulous fairness and good faith in [her] dealings with [Hatfield-Bingaman] and refrain[ed] from using [her] position to [Hatfield-Bingaman's] detriment and [her] own

advantage." See Matter of Estate of Evasew, 584 A.2d 910, 913 (Pa. 1990).  When a person who owes a fiduciary duty to another enters into a contract they "'must prove by clear and convincing evidence that the contract was free, voluntary and an independent act of the other party, entered into with an understanding and knowledge of its nature, terms and consequences." Paone v. Dean Witter Reynolds, Inc., 789 A.2d 221, 226 (Pa. Super. Ct. 2001).  Because a confidential relationship involves trust and confidence, arm's length bargaining is not assumed, and overreaching by the dominant party for her own benefit "permits the aggrieved party to rescind the transaction." Id.  "'This is so because the presence of a confidential relationship negates the assumption that each party is acting in [her] own best interest.'" Id. (quoting Frowen v. Blank, 425 A.2d 412, 416 (1981)).

Here, Hatfield-Bingaman avers that she was told the Policy was worth $74,000, not $148,000. (Hatfield-Bingaman Dep., Dkt. 34-6, at 10.)  She avers that Moore told her that she desperately needed the money to cover Budd's debts, and that legal action would be taken against her if she did not sign the disclaimer.  (Id. at 4-7, )  Moore, however, claims Hatfield-Bingaman was never threatened with legal action and that she showed Hatfield-Bingaman the Policy beneficiary form which indicated how much the Policy was worth. (Moore Dep., Dkt. 43-3, at 11.)  Accordingly, as there is also a genuine issue of material fact as to whether Moore fulfilled her duties pursuant to any possible fiduciary duty, this question is best left to a finder of fact.

15

D.  Fraudulent Misrepresentation

Hatfield-Bingaman's second claim in support of voiding the Disclaimer is that Moore fraudulently misrepresented material facts that she relied upon to her detriment.  (Mt. S.J., Dkt. 35, at 18.)  It is Moore's position that there is a genuine issue of material fact as to whether there was a fraudulent misrepresentation.  (Opp. Mt. S.J., Dkt. 43, at 15.)

Under Pennsylvania law, the elements of fraudulent misrepresentation are:

(1) A representation;
(2) which is material to the transaction at hand;
(3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false;
(4) with intent of misleading another into relying on it;
(5) justifiable reliance on the misrepresentation; and,
(6) the resulting injury was proximately caused by the reliance.

Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999); see Farina v. Conestoga Title Ins. Co., 81 Pa. D. & C. 4th 548, 555 (Ct. Com. Pl. 2006).   "A fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture."  Frowen v. Blank, 425 A.2d 412, 415 (Pa. 1981). "A misrepresentation is material if it likely would have induced a reasonable person to enter into the contract."  Redick v. Kraft, Inc., 745 F. Supp. 296, 301 (E.D. Pa. 1990).  "A misrepresentation is fraudulent if the person making it knew or believed that his assertion was false at the time he made it."[2]  Id.

---

[2] "Even if the misrepresentation [is not] fraudulent, the agreement may still be voidable because the misrepresentation was material.  Where the misrepresentation is material, the

16

"The issue of whether a party's reliance on another's fraudulent misrepresentation is justified or unjustified is usually considered to be a question of fact." Busy Bee Inc. v. Corestates Bank N.A., 67 Pa. D. & C. 4th 496, 515 (Ct. Cm. Pl. 2004). "Since the 'reasonableness of reliance involves all of the elements of the transaction,' 'the question of justifiable reliance is most appropriately left to the jury . . . and is rarely susceptible of summary disposition.'" Id. (quoting Krisa v. Equitable Life Assurance Soc'y, 113 F. Supp. 2d 694, 706 (M.D. Pa. 2000)). The party alleging fraud has the burden of proving the same by clear and convincing evidence.[3] Moser v. DeSetta, 589 A.2d 679 (Pa. 1991).

Hatfield-Bingaman avers that the following four material misrepresentations were made by Moore to her: 1) that the Policy was a $74,000 double indemnity policy when it was not a double indemnity policy and was worth $148,000; 2) that Hatfield-Bingaman would become involved in a lawsuit if she did not execute the Disclaimer; 3) that the Policy proceeds were desperately needed to pay Budd's debts; and 4) that the Policy proceeds would be paid to

_____

party making the misrepresentation may believe his assertion to be true. Even so, the agreement is voidable by the recipient because the misrepresentation induced him to manifest invalid assent." Rittenhouse v. Shubert, Civ. A. No. 88-4682, 1989 WL 54030, at *3 (E.D. Pa. 1989) (citations omitted).

[3] Hatfield-Bingaman's contention that she "does not have the burden of proving the existence of material misrepresentation" is incorrect. (Mt. S.J., Dkt. 35, at 21.) Hatfield-Bingaman assumes that a confidential relationship was clearly established in making these claims, which is not currently the case. Accordingly, Hatfield-Bingaman is required to prove each and every element of a fraudulent misrepresentation claim in order to be entitled to summary judgment.

Budd's estate if Hatfield-Bingaman disclaimed her interest. (Mt. S.J., Dkt. 35, at 19-20.)

It is clear that each of these representations was made, and accordingly, the first element of fraudulent misrepresentation, that representations were made, is satisfied. Although there is disagreement as to what was meant by some of the statements, there is no disagreement that the Policy was presented to Hatfield-Bingaman as a $74,000 double indemnity policy (Walker Dep., Dkt. 43-6, at 3), that a potential lawsuit was mentioned (id. at 5), that the Policy proceeds were needed to pay debts (id.), and that the proceeds would be paid to Budd's estate.[4] (Hatfield-Bingaman Dep., Dkt. 34-6, at 6.) There are, however, genuine issues of material fact as to the remaining elements.

Attorney Walker admits that she had not seen the Policy at the time of the May 8, 2008 meeting. (Walker Dep., Dkt. 43-6, at 3.) She also admits that she told Hatfield-Bingaman that the Policy was a $74,000 double indemnity policy. She acknowledges that upon reviewing the Policy, she realized that her statement was false, it was not a double indemnity policy, and was worth $148,000. (Id.)

There is also evidence indicating that Moore misrepresented her financial condition. During Attorney Walker's deposition the following exchange took place:

> Q.    Now, did you make the statement to her that anything to the effect that

---

[4] Moore admits that at all relevant times Attorney Walker was acting as her agent. (Moore Ans. Cross-Claim, Dkt. 17, at ¶ 32.) Accordingly, Moore will be liable for misrepresentations made by Attorney Walker. See Wisniski v. Brown & Brown Ins. Co. of PA, 906 A.2d 571, 577 (Pa. Super. Ct. 2006).

she was entitled to the entire proceeds of the policy free of any claim by anybody?

A.  No, I didn't make any such statement.  I did tell her what Faye had told me, which was that Faye was distraught about the finances of the situation, that she did not think she was going to have enough money to even pay the funeral bill, and that she desperately needed to have this insurance money to take care of Budd's debts.

Q.  Now, at that time you considered that to be a true statement?

A.  Yes, I did. Well, I didn't have any independent verification of it.  I was going on what Faye was telling me.

(Id. at 5.)

There is a genuine issue of material fact as to whether Moore knew that she was not financially destitute.  (Moore Dep., Dkt. 43-3, at 147.)  During Moore's deposition, the following exchange took place, "Q.  At the meeting you knew that there were four annuities.  You believed you were the beneficiary of those annuities and you did not, in your discussion with Kristi about your financial status disclose them?   A. No."  (Id.)  As it is unclear as to what Moore's "No" is in reference to, this Court is unable to determine whether Moore in fact knew that there were other assets that she would receive.  (See id.)

Additionally, although Moore had the Policy beneficiary form with her at the May 8, 2008 meeting (Moore Dep., Dkt. 43-3, at 12), Hatfield-Bingaman testified that she did not look at the beneficiary form because Moore had told her it was a mistake and that she was not supposed to be the beneficiary and that she was going to be sued if she did not sign the disclaimer. (Hatfield-Bingaman Dep., Dkt. 34-6, at 5.)  This assertion, if credited, may also support a fraudulent inducement claim.

19

Hatfield-Bingaman avers that each of the alleged misrepresentations made by Moore were the proximate cause of her decision to sign the Disclaimer. Her understanding that there was not enough money to pay Budd's debts and that the Disclaimer would allow the Policy proceeds to go to Budd's estate in order to pay his debts and expenses is reasonable and could be a proximate cause of signing the Disclaimer. Moore admits she stated she needed the money for that purpose and the total amount of Budd's estate was never disclosed to Hatfield-Bingaman. The difference in the Policy proceeds also plays a role in the determination to disclaim the interest. Hatfield-Bingaman was offered $24,000 as a "gift" for signing what she thought was a disclaimer of $74,000, not a $148,000 policy. Accordingly, the amount of the Policy would be a material fact that would reasonably play a role in the decision to disclaim the proceeds. Furthermore, Hatfield-Bingaman has testified that fear of litigation also played a role in her decision to sign the Disclaimer. (Hatfield-Bingaman Dep., Dkt. 34-6, at 7.)

Ultimately, however, the question of fraudulent inducement presents a matter for the trier-of-fact. Thus, the summary judgment motion on this claim must be denied.

E. Duress

Hatfield-Bingaman's next claim is that the Disclaimer should be voided because she was under duress when she signed it. (Mt. S.J., Dkt. 35, at 24.) In support of this claim she alleges that she was not provided with a reasonable and adequate opportunity to speak with counsel, that Moore concealed the purpose of the meeting, and that no advance communications or

documents were given to her regarding the meeting. (Id. at 25.) Moore counters that Hatfield-Bingaman was not under duress because she was not physically sick, she described the conversation with Moore as "friendly", "she did not ask for any time to think over whether to sign the Disclaimer", "she was never prohibited from leaving the room", she had a cell phone she could have used, and she is an adult who has never been declared incompetent. (Opp. Mt. S.J., Dkt. 43, at 24.)

"Duress is 'that degree of restraint or danger, either actually inflicted or impending, which is sufficient to severity or apprehension to overcome the mind of a person of ordinary firmness.'" Bata v. Central-Penn Nat. Bank of Philadelphia, 224 A.2d 174, 180 (Pa. 1966) (quoting Smith v. Lancher, 205 A.2d 626, 626 (Pa. 1964)). As explained in Otto v. Powers, 110 A.2d 847, 848 (Pa. Super. Ct. 1955):

> There are different types of duress. One consists of improper threats of various types of legal action. Another consists of threats of actual bodily harm. In each of the cases where the Court has said there can be no duress where a party had the opportunity to consult counsel the alleged duress has been of the former type . . . . Where one is threatened with a legal action which, if pursued, would be improper, consultation with a lawyer would promptly set the party right and the lawyer would advise the party of any actual legal rights, and he could act accordingly.

"[I]n the absence of threats of actual bodily harm there can be no duress where the contracting party is free to consult with counsel." Carrier v. William Penn Broad. Co., 233 A.2d 519, 521 (Pa. 1967).

Moore's son, Andrew G. Kilbride, who was present in Attorney Walker's office on May 8,

2008, indicated that when they started the meeting, Attorney Walker said:

> [T]here is something that Faye wants to talk to you about, and [Attorney Walker] said this would prevent us from taking any legal action, and then that's when my mom started to talk about what had gone on, about us building a life together, how we had a wedding at our house, how we did everything to become a family, and then showed her the paper.

(Kilbride Dep., Dkt. 43-5, at 3.)  Kilbride was further questioned about Attorney Walker's comment concerning litigation:

> Q.    Now, when Martha Walker talked about litigation, what do you recall her saying about that?
> A.    Just that this prevents us from taking any legal action, but she didn't say against who.
> Q.    Okay.  The only person she was talking to was Kristi?
> A.    And my mom. Both.  They were both sitting next to each other.

(Kilbride Dep., Dkt. 34-7, at 5.)  Later in Kilbride's deposition the following exchange took place:

> Q.    Did Martha Walker ever say to Kristi: You have an absolute right to these insurance proceeds?  Did she ever say that?
> A.    No.
> Q.    And when she said about litigation, did she ever say by the way, Kristi we cannot bring litigation against you.  It would have to be against somebody else?  Did she ever say that?
> A.    No.

(Id. at 7.)

During Attorney Walker's deposition she testified that it is her standard policy that anyone who signs anything in her office "of a nature of a legal document" is advised that they have the right to take the document to an attorney to be reviewed.  (Walker Dep., Dkt. 43-6, at 5.)  Attorney Walker, however, does not have a present recollection of saying this to Hatfield-

22

Bingaman, and admits that she squeezed this appointment into her normal schedule, was running late from three previous appointments, and had a lunch meeting. (Id. at 4-5.) The following exchange took place during the course of Attorney Walker's deposition:

> Q.   Let's [sic] talk about the no threats or intimidation. I want to ask you about is this matter of legal action would be taken, you testified earlier about Faye intending to go after the Board of Education?
> A.   Yes.
> Q.   And that would be legal action, correct?
> A.   Correct, yes.
> Q.   That would be taken if Kristi didn't sign the disclosure?
> A.   I didn't say that. I said that Faye was upset with the Washington County Board of Education because she thought she had been screwed over by them after they had assured her that she was the beneficiary on absolutely everything, and that she was contemplating legal action against them and that – and I said that if that happened, that Kristi would be a part of that litigation because she was the beneficiary on the insurance.
> Q.   So was it your intention at that time, at least as you perceived it, that she would have been a party to that because she was the beneficiary?
> A.   I would assume she would have to be.
> Q.   And that she would have to get a lawyer you mentioned?
> A.   I did mention.
> Q.   And that would be an expense?
> A.   She would have to have an attorney and that would be an expense to her, yes.
> Q.   So that would have been litigation involving her as a party, and if she signed the disclaimer, then the insurance would have gone the way Faye wanted it to go?
> A.   Well, sure.
> Q.   So then there would be no legal action?
> A.   I didn't say one way or another whether there would be still legal action.
> Q.   Would a reasonable person have assumed . . .
> A.   I don't know what a reasonable person would have assumed from the comment.
> Q.   Do you believe Kristi assumed . . .
> A.   I don't know what Kristi assumed.

23

Q. That by signing the disclaimer she would not be involved in litigation?

A. I don't know whether she believed that or not. She didn't ask any questions about that one way or the other.

Q. Do you – did you find her to be a quiet person?

A. Yes, but I asked her several times if she had questions. I also asked her if she understood what she was signing, and to which she said yes.

(Id. at 7.)

Moore recalled that at the meeting Attorney Walker had said, "I am glad it went so well. Everything is fine, so there wouldn't be any litigation." (Moore Dep., Dkt. 43-3, at 13.) Moreover, when asked whether it was suggested that Hatfield-Bingaman take the Disclaimer to have it reviewed, Moore stated no. (Id. at 14.) Furthermore, Moore never heard Hatfield-Bingaman be advised that she should consult with an attorney before signing the Disclaimer. (Id.)

Hatfield-Bingaman testified at her deposition that "Martha Walker looked at me and said that we would have to come to some kind of agreement or legal action would be taken." (Hatfield-Bingaman Dep., Dkt. 34-6, at 4; Id. at 7 ("All's I heard was, if we don't come to some kind of agreement, we will seek legal action. That is what I heard".) ) Hatfield-Bingaman stated: "I didn't know what to say after that. The first thing that went in my head was, I couldn't afford a lawyer. You know, I didn't work. You know, what was I to do." (Id.)

It is apparent that there is a genuine dispute of material fact as to whether Hatfield-Bingaman was induced to sign the Disclaimer under threat of litigation without being afforded an opportunity to confer with counsel. Although threats of physical harm were never made

24

against Hatfield-Bingaman, a reasonable juror could determine that a person of ordinary firmness would feel threatened with impeding legal action when presented with a disclaimer at an attorney's office, told legal action could be taken, not notified they were entitled to counsel, and not given any advance notice as to what the meeting would concern. A reasonable juror could determine that Hatfield-Bingaman was under duress at the time she signed the Disclaimer as it is unclear whether Hatfield-Bingaman knew she could consult with an attorney, who would have told her that legal action could not be taken against her if she refused to sign the Disclaimer. See Otto, 110 A.2d at 848; Carrier, 233 A.2d at 521. Accordingly, summary judgment is not appropriate.

F.    Unclean Hands

Hatfield-Bingaman's final contention is that "Moore has unclean hands and is estopped from seeking relief." (Mt. S.J., Dkt. 35, at 26.) Although Hatfield-Bingaman correctly cites the standard used under the doctrine of unclean hands, she presents no argument in support of a claim that the doctrine of unclean hands is applicable in this situation. (Id.) The Court assumes that the argument is that Moore is estopped from claiming rights under the Policy because Moore failed to act in good faith. Moore's brief in opposition provides no argument in opposition to Hatfield-Bingaman's unclean hands theory.

The doctrine of unclean hands is based on the theory that those who come to a court of equity must do so  with clean hands. Lee v. Lee, 978 A.2d 380, 387 (Pa. Super. Ct. 2009)

(quoting Shenango Valley Osteopathic Hosp. v. Dep't of Health, 451 A.2d 434, 440 (Pa. 1982).

"'The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy at issue.'" Id. (quoting Shenango Valley Osteopathic Hosp., 451 A.2d at 440).  As there is a factual issue as to whether Moore acted deceitfully or fraudulently, the unclean hands issue cannot be resolved on a summary judgment motion.

III.    CONCLUSION

　　　　For the above-stated reasons, Kristi Hatfield-Bingaman's Motion for Summary Judgment will be denied.  Although the May 8, 2008 Disclaimer is valid, there are genuine issues of material fact concerning whether the Disclaimer is voidable as a result of alleged fraudulent misrepresentations, violation of fiduciary duties, or duress.  An appropriate order follows.

　　　　　　　　　　　　　　　s/ Thomas I. Vanaskie
　　　　　　　　　　　　　　　Thomas I. Vanaskie
　　　　　　　　　　　　　　　United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RELIASTAR LIFE INSURANCE COMPANY :
                    Plaintiff          :
                                       :
        v.                             :        1:CV-08-1942
                                       :        (JUDGE VANASKIE)
FAY MOORE,                             :
KRISTI HATFIELD-BINGAMAN               :
                    Defendants         :

## ORDER

NOW, THIS 12th DAY OF MARCH, 2010, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1. Kristi Hatfield-Bingaman's Motion for Summary Judgment on Cross-Claim Against Moore (Dkt. 34) is DENIED.

2. A telephone scheduling conference shall be held on Monday, April 19, 2010, at 10:00 a.m. Counsel for Kristi Hatfield-Bingaman is responsible for placing the call to (570) 207-5720, and all parties should be ready to proceed before the undersigned is contacted.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge